William F. Dougherty
Michael J. Walsh
Burke & Parsons
100 Park Avenue
New York NY  10017-5533
Telephone:  (212) 354-3800
Telefax:    (212) 221-1432
Email:      dougherty@burkeparsons.com
            walsh@burkeparsons.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **OSG Ship Management, Inc., and  1372 Tanker Corporation as owner of the M/V OVERSEAS MULAN (IMO NO. 9230880)**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**O.W. Bunker USA Inc., OW Bunker Middle East DMCC, Chemoil Corporation, Chemoil Middle East DMCC, GPS Chemoil LLC FZC, and ING Bank NV**<br><br>**Defendants.** | **14 Civ 9973 (VEC)**<br><br>**ECF CASE** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
***EX PARTE* APPLICATION FOR RESTRAINING ORDER**

Interpleader Plaintiffs, OSG Ship Management, Inc. and 1372 Tanker Corporation  on their

own behalves and for the M/V OVERSEAS MULAN (IMO 9230880) (collectively, "OSG"), by and

through their undersigned counsel, hereby file this memorandum of law in support of their *Ex Parte*

Application for Restraining Order, pursuant to the Federal Interpleader Act, 28 U.S.C. § 2361, and

the deposit of funds into the registry of the Court, pursuant to Rule E(5)(a) of the Supplemental

Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions to the Federal Rules of Civil

Procedure (the "Supplemental Admiralty Rules").

## STATEMENT OF FACTS

**A.      The OSG-O.W. Bunker USA Inc. Contract**

On or about October 20, 2014, OSG contracted, through its commercial manager agent

DoJi Marine Trading, LLC ("DoJi"), with O.W. Bunker USA Inc. ("OWB-USA") for the supply of

4,199.986 metric tons of marine fuel oil (the "Fuel") to the M/V OVERSEAS MULAN (the

"Vessel") in Fujairah, in the United Arab Emirates.  This agreement was documented in OWB-

USA's Sales Confirmation, dated October 20, 2014.  *See* Exhibit A to OSG's Complaint for

Interpleader (the "Complaint").

The OWB-USA Sales Confirmation stated that the "Supplier" of the Fuel would be

"Chemoil."  *See* Complaint, Exhibit A.

Among the Terms and Conditions recited on the OWB-USA Sales Order Confirmation is a

provision entitled "Terms," that states as follows:

> The sale and delivery of the marine fuels described above are subject to
> the OW Bunker Group's Terms and Conditions of sale(s) for Marine
> Bunkers.  The acceptance of the marine bunkers by the vessel named
> above shall be deemed to constitute acceptance of the said general
> terms applicable to you as 'Buyer' and to O. W. Bunker USA Inc. as
> "Seller".  The fixed terms and conditions are well known to you and
> remain in your possession.  If this is not the case, the terms can be found
> under the web address:  http://owbunkers.com/wp-
> content/uploads/2013/12/OWB_GTC_ValidFrom01092013.pdf.

*See* Complaint, Exhibit A.

The O.W. Bunker Group Terms and Conditions of Sale for Marine Bunkers, Edition 2013

("O.W. Group Terms and Conditions") can be found at the worldwide web address provided in

the "Terms" provision on the OWB-USA Sales Order Confirmation.  Paragraph P of the OW

Group Terms and Conditions states that English law shall apply to the marine fuels (also

referred to as "bunkers") supply contract and that all disputes arising in connection with the

contract shall be settled by arbitration in London, England in accordance with the Arbitration

Act 1996 (or any subsequent amendment).  *See* Complaint, Exhibit B.

Paragraph L.4(a) of the O.W. Bunker Group's Terms and Conditions provides further that

certain terms and conditions may be varied when a third-party vendor is (i) the actual physical

supplier of the contracted fuel and (ii) requires that its own terms and conditions govern the

fuel supply transaction.  Paragraph L.4(a) provides as follows:

> These Terms and Conditions are subject to variation in circumstances
> where the physical supply of the Bunkers is being undertaken by a third
> party which insists that the Buyer is also bound by its own terms and
> conditions.  In such circumstances, these Terms and Conditions shall be
> varied accordingly, and the Buyer shall be deemed to have read and
> accepted the terms and conditions imposed by the said third-party.

*See* Complaint, Exhibit B.

In instances in which the physical supply of the marine fuel, or bunkers, is undertaken by

a third party whose terms specify a forum for dispute resolution that differs from the London

arbitral forum set forth in Paragraph P of the O.W. Bunker Group Terms and Conditions, the

forum and governing law selected by the third-party physical supplier shall prevail.  Paragraph

L.4(b)(ii) further provides as follows:

> Without prejudice or limitation to the generality of the foregoing, in the
> event that the third-party terms include: ... a different law and/or forum
> selection for disputes to be determined, then such law selection and/or
> forum shall be incorporated into these terms and conditions.

*See* Complaint, Exhibit B.

**B.      The OWB-USA – Chemoil Middle East DMCC Contract**

Upon information and belief, after concluding its marine fuel sale agreement with OSG,

OWB-USA or OW Bunker Middle East DMCC contracted with Chemoil Middle East DMCC

("Chemoil DMCC") to actually supply the Fuel to the Vessel at Fujairah, as evidenced by a

Chemoil Order Confirmation dated October 21, 2014.  *See* Complaint, Exhibit C.  The Chemoil

Order Confirmation, which identifies Chemoil DMCC as the "Seller" of the Fuel, provides that

the sale is based upon Chemoil's standard terms and conditions.  Paragraph 6 of the Chemoil

Order Confirmation provides as follows:

> This sale is based on the standard terms and conditions of sale of marine
> fuel by Chemoil Energy Group of Companies (May 2012).  Fuel Oil will be
> supplied with the express recognition that prearrangement was
> authorized by the owner of the vessel as defined by Section 971 of the
> Federal Maritime Lien Act.

*See* Complaint, Exhibit C.

**C.      Delivery of the Fuel to the Vessel**

The Fuel was delivered to the Vessel on or about October 28, 2014 in the port of

Fujairah, as is documented by a Bunker Delivery Note issued on that date by GPS Chemoil LLC

FZC ("GPS Chemoil"), the apparent physical supplier of the Fuel.  *See* Complaint, Exhibit D.

At the bottom of the GPS Chemoil Bunker Delivery Note is a printed statement which

states that "[t]he marine fuel described herein is delivered in accordance with Chemoil

Corporation's standard terms and conditions of sale (a copy of which has been provided to

buyer prior to delivery) and on credit of the vessel."  *See* Complaint, Exhibit D.

On or about October 29, 2014, Chemoil DMCC issued its invoice No. 2304305, dated

October 29, 2014, in the amount of $2,007,593.31, to OW Bunker Middle East DMCC, for the

Fuel delivered to the Vessel on or about October 28, 2014 (the "Chemoil DMCC Invoice").  *See*

Complaint, Exhibit E.

Three days later, in an invoice dated November 1, 2014, OWB-USA billed OSG

$2,024,393.25 for the Fuel (the "OWB-USA Invoice").  *See* Complaint, Exhibit G.  Under the

terms of the OWB-USA Invoice, payment for the Bunkers was due on or about November 26,

2014.

OWB-USA and two if its affiliates, O.W. Bunker Holding North America Inc. and O.W.

Bunker North America Inc., filed for relief under Chapter 11 of the Bankruptcy Code before the

United States Bankruptcy Court for the District of Connecticut on or about November 13, 2014

(the "O.W. Bunker Bankruptcy Proceedings"), before OSG had remitted payment for the Fuel to

OWB-USA.

**D.**     **The Chemoil Demand for Payment**

In a November 17, 2014 email to DoJi, Chemoil DMCC asserted a competing right to

receive direct payment from OSG for the Fuel in the amount of $2,007,593.31 and warned that

"[a]ll Chemoil Middle East DMCC's rights remain reserved, *including as to action against the*

*vessel* in the event that the outstanding sum is not settled" (the "Chemoil Demand") [emphasis

added].  *See* Complaint, Exhibit H.  Attached to this email were (i) the Chemoil DMCC Invoice,

(ii) the GPS Chemoil Bunker Delivery Note, and (iii) the Chemoil DMCC Order Confirmation for

the Fuel sold by Chemoil DMCC to OW Bunker Middle East DMCC for delivery to the Vessel.  *See*

Complaint, Exhibit H.

**E.      The Chemoil General Terms and Conditions for the Sale of Marine Fuels**

Clause 14 of Chemoil's General Terms and Conditions for the Sale of Marine Fuels (the

"Chemoil Terms and Conditions"), which had been referenced or incorporated into the GPS

Chemoil Bunker Delivery Note and the Chemoil Order Confirmation, provides for an irrevocable

submission of disputes arising from contracts that are governed by the Chemoil Terms and

Conditions to the exclusive jurisdiction of the U.S. District Court for the Southern District of

New York.

In pertinent part, this Clause 14 provides as follows:

> Except as otherwise provided herein, each of the Parties hereby
> irrevocably submits to the exclusive jurisdiction of the United States
> District Court for the Southern District of New York or, if such court does
> not have jurisdiction or shall not accept jurisdiction, to any court of
> general jurisdiction in and for the County of New York in the State of New
> York for the resolution and determination of any dispute between the
> Parties relating to the construction, meaning or effect of this Contract, or
> the rights and liabilities of the Parties hereunder, or any matter arising
> therefrom or connected therewith.  Each of the Parties hereby
> irrevocably waives objection to such suit based upon forum non
> conveniens and venue.

*See* Complaint, Exhibit F.

**F.      Competing Claims Demanding Payment for the Fuel**

Both OWB-USA and Chemoil DMCC have asserted claims for payment of their respective

invoices for the Fuel supplied to the Vessel at Fujairah on October 28, 2014 (the "Disputed

Funds").[1]  Additionally, upon information and belief, OSG is aware that, in cases involving other

---

[1] There is a $16,700.94 difference between the OWB-USA and Chemoil DMCC invoices, presumably representing OWB-USA's profit margin on its sale to OSG.  For purposes of its application for an Order directing OSG to pay the Disputed Funds into the registry of the Court, the Disputed Funds shall refer to the amount of the OWB-USA Invoice ($2,024,393.25), plus interest thereon at a rate of 6 percent per annum through December 31, 2015, as required by Rule E(5)(a), Supplemental Admiralty Rules.

marine fuel supply contracts between various O.W. Bunker entities and other vessel owners or

charterers, ING Bank NV ("ING") has asserted senior rights in the receivables, owed by those

vessel owners or charterers, to members of the O.W. Bunker Group.  These senior rights in said

receivables are alleged to exist pursuant to an Omnibus Security Agreement, dated December

19, 2013, between O.W. Bunker & Trading A/S and its subsidiaries (which are believed to

include OWB-USA), arising out of an alleged assignment to ING, as Security Agent, of certain

rights in the O.W. Group supply contracts.  Consequently, in addition to claims for payment

asserted by OWB-USA and Chemoil DMCC, OSG fears ING may also seek to collect amounts

allegedly owed ING under the purported security agreement.

**G.      Proceedings Before the U.S. Bankruptcy Court for the District of Connecticut**

    Following the commencement of the O.W. Bunker Bankruptcy Proceedings on

November 13, 2014, OSG was aware that the Disputed Funds could be considered "property of

the estate" of the Debtor OWB-USA under the Bankruptcy Code.  After its receipt of Chemoil

DMCC's November 17 email (that threatened the arrest of the Vessel if OSG failed to pay the

Chemoil Demand directly to Chemoil DMCC), OSG, through its bankruptcy counsel, Cleary,

Gottlieb, Steen & Hamilton LLP ("Cleary Gottlieb),"  contacted counsel for both OWB-USA and

Chemoil in an attempt to work out a consensual arrangement for paying the Disputed Funds so

as to avoid arrest of the Vessel.  *See* Complaint, Exhibit I.

    Counsel for OWB-USA failed to respond to the Cleary Gottlieb letter.  Counsel for

Chemoil insisted that OSG provide security to Chemoil in the full amount of its asserted claim,

plus costs and interest, irrespective of the existence of the OWB-USA Invoice, or other

competing demands from other interested parties for security arising from delivery of the same

Fuel.  OSG concluded that Chemoil's demand for exclusive security for its claim would not prevent the risk of arrest or attachment of the Vessel for a claim by OWB-USA, or ING, for the very same delivery of the Fuel.  As a result, no consensual resolution was reached.

On November 26, 2014, faced with the threat of imminent arrest of the Vessel, OSG commenced an adversary proceeding in the United States Bankruptcy Court in Connecticut under Adversary Proceeding No. 14–05065, by filing a complaint for interpleader against defendants O.W. Bunker USA Inc., Chemoil Corporation, Chemoil Middle East DMCC, and GPS Chemoil LLC FZC.  After filing its interpleader complaint, OSG moved the Bankruptcy Court on December 5, 2014 for permission to deposit the Disputed Funds into the registry of the United States District Court for the District of Connecticut and for a statutory restraining order pursuant to 28 U.S.C. § 2361 and 11 U.S.C. § 105 to prevent the interpleader defendants in the adversary proceeding from taking action anywhere in the world to arrest the Vessel.

At the Bankruptcy Court hearing on OSG's motions which commenced on the afternoon of December 9, 2014, and which continued and concluded on December 10, 2014, Bankruptcy Judge Alan H.W. Shiff commented, among other things, that in his view neither 28 U.S.C. § 2361 nor 11 U.S.C. § 105 provided authority for the Bankruptcy Court to grant the requested worldwide restraining order against the interpleader defendants that OSG sought in the adversary proceeding, and he asked whether OSG wished to pursue its pending motions.  OSG responded (through its counsel) that OSG would withdraw its pending motions.  Accordingly, shortly after the conclusion of the hearing, OSG withdrew its respective motions to deposit the Disputed Funds into the registry of the Court and for restraining order.  OSG also voluntarily dismissed its interpleader action in the Bankruptcy Court.  *See* Complaint, Exhibit J.

### NECESSITY OF INTERPLEADER

Pursuant to United States maritime law, the contract supplier of "necessities," like fuel, to a vessel (in other words, a party such as OWB-USA) may assert a maritime lien against the vessel receiving the necessaries under the Maritime Lien and Commercial Instruments Act, 46 U.S.C. § 31301, *et seq.*  Additionally, *under certain circumstances*, a physical supplier of marine fuel (possibly including Chemoil DMCC and GPS Chemoil) may also assert a maritime lien against that vessel (as asserted in the Chemoil DMCC Invoice and the Chemoil Demand). Accordingly, in this case, more than one claimant has asserted rights to the amounts owed for the sale and delivery of the Fuel.

OSG cannot ascertain whether the Disputed Funds should be paid to OWB-USA, Chemoil, Chemoil DMCC or GPS Chemoil, or any other party, such as ING, that may assert another competing interest or maritime lien, in order to extinguish all maritime liens and to prevent attempts to arrest the Vessel.

The Vessel is presently en route to Fujairah with an estimated date of arrival of December 22, 2014.  *See* Complaint, ¶ 40.  Upon her arrival in Fujairah or in any subsequent port, the Vessel could face an attempted arrest, attachment, seizure or detention by one or more of the Interpleader Defendants claiming to possess a maritime lien or other claims against the Vessel.  Such an arrest, attachment, seizure or detention, or any other possible judicial action against the Vessel would cause harm to the Interpleader Plaintiffs, delay the Vessel and adversely affect innocent third parties with interests in the Vessel's cargo and generally inhibit maritime commerce.  *See* Complaint ¶ 40.

**RELIEF REQUESTED**

OSG respectfully requests that this Court issue Orders (i) directing OSG to deposit the Disputed Funds into the registry of the Court, and, upon satisfactory proof that such deposit has been made, (ii) restraining the Interpleader Defendants and any other claimants, presently or subsequently known, from commencing or prosecuting any proceeding in the courts of any state or within any United States District Court, or in any other forum anywhere in the world, against OSG, *in personam*, or the Vessel, *in rem*, arising out of claims to the Disputed Funds, and the supply of Fuel to the Vessel at Fujairah on October 28, 2014.

**ARGUMENT**

A.    **Statutory Interpleader**

The statutory basis for the relief requested by OSG is provided by the Federal Interpleader Act, 28 U.S.C. § 2361, which provides that:

> In any civil action of interpleader or in the nature of interpleader under section 1335 of this title, a district court may issue its process for all claimants and enter *its order restraining them from instituting or prosecuting any proceeding in any State or United States court affecting the property, instrument or obligation involved in the interpleader action until further order of the court.*  Such process and order shall be returnable at such time as the court or judge thereof directs, and shall be addressed to and served by the United States marshals for the respective districts where the claimants reside or may be found.

> Such district court shall hear and determine the case, and may discharge the plaintiff from further liability, make the injunction permanent, and make all appropriate orders to enforce its judgment.

*See* 28 U.S.C. § 2361 (emphasis added).

The U.S. Supreme Court has recognized, in *State Farm Fire & Casualty Co. v. Tashire*, 286 U.S. 523 (1967), that where, as here, a number of claimants are contending for possession of a

limited "fund" that has been deposited into the Court by a disinterested stakeholder, the interpleader confines the litigation to a single forum and proceeding and protects the stakeholder from "vexatious and multiple litigation."  *Id.* at 534, *see also Fidelity Brokerage Services v. Bank of China*, 192 F. Supp. 2d 173, 177 (S.D.N.Y. 2002) ("Interpleader is designed to protect stakeholders from undue harassment in the face of multiple claims against the same fund, and to relieve the stakeholder from assessing which claim among many has merit.").  In *Tashire*, the Supreme Court also observed that 28 U.S.C. § 2361 is remedial in nature and should be "liberally construed."  286 U.S. at 533.

"Notice and hearing prior to the issuance of a temporary restraining order or a preliminary injunction are not required by [Section] 2361 or by Rule 65(a), Fed.R.Civ.P."  *Aetna Cas. & Sur. Co. v. Ahrens*, 414 F. Supp. 1235, 1242 (S.D. Tex. 1975); *Holcomb v. Aetna Life Ins. Co.*, 228 F.2d 75, 82 (10th Cir. 1955).  The injunction provided by 28 U.S.C. § 2361 is excepted from the requirements of Rule 65(b) of the Federal Rules of Civil Procedure by Rule 65(e), which provides, in pertinent part:  "These rules do not modify . . . 28 U.S.C. § 2361, which relates to preliminary injunctions in actions of interpleader or in the nature of interpleader."

**B.     OSG Has Satisfied the Statutory Prerequisites
for Issuance of a Restraining Order**

The prerequisites of statutory interpleader,[2] as provided in 28 U.S.C. § 1335, may be simply stated.  The district courts have original jurisdiction over interpleader actions when the

---

[2] OSG might also invoke Rule 22 of the Federal Rules of Civil Procedure, which reads in part "[p]ersons with claims that may expose a plaintiff to double or multiple liability may be joined as defendants and required to interplead." There is no requirement for even minimal diversity under a Rule 22 interpleader, although, the interpleader plaintiff, proceeding under Rule 22 must establish an "independent basis for subject matter jurisdiction."  *Glencova Inv. Co. v. Trans-Resources Inc.*, Nos. 08-7140, 11-5602, 11-7923, 2012 WL 2196670, at *10 (S.D.N.Y. June 14,

amount at stake is $500 or more, and the action presents "[t]wo or more adverse claimants, of diverse citizenship."  28 U.S.C. § 1335(a).  The statute also requires that the interpleader plaintiff, or stakeholder, deposit the disputed fund into the registry of the Court to abide the judgment of the Court.  *See Union Central Life Ins Co. v. Berger*, No. 10-8408, 2012 WL 4217795, at *6 (S.D.N.Y. Sept. 20, 2012).

As recited in the Complaint, there is more than the required minimal diversity among the potential claimants in this action, *see* Complaint, ¶¶ 4-10.  Further, there can be no reasonable dispute that the amount in controversy in this case is more than $500.

In deciding whether an interpleader is appropriate, the Court must determine whether OSG legitimately fears multiple liability against a single fund, regardless of the merits of the competing claims.  *Fidelity Brokerage Services,* 192 F. Supp. 2d at 178.  Clearly, in this case, the threat of competing claims asserted by OWB-USA, Chemoil DMCC and ING are quite real and could lead to competing attempts to enforce maritime liens against the Vessel.

If a court decides that the jurisdictional requirements of 28 U.S.C. § 1335 have been met, it will discharge the interpleader plaintiff and proceed to adjudicate claims among the remaining adverse parties.  *Perlman v. Fidelity Brokerage Services LLC*, 932 F. Supp. 2d 397, 415 (E.D.N.Y. 2013); *N.Y. Life Ins. Co. v. Apostolidis*, 841 F. Supp. 2d 711, 716-17 (S.D.N.Y. 2012).

**C.**     **The Court Has Personal Jurisdiction Over the Interpleader Defendants**

The court has personal jurisdiction over OWB-USA, Chemoil, Chemoil DMCC and GPS Chemoil by virtue of the consent to the exclusive jurisdiction of the U.S. District Court for the

---

2012).  Invocation of the Court's admiralty and maritime jurisdiction provides such an independent basis of subject matter jurisdiction in this case.  28 U.S.C. § 1333.

Southern District of New York that is contained in Chemoil's General Terms and Conditions and which was incorporated into the Chemoil Order Confirmation, GPS Chemoil Bunker Delivery Note and the O.W. Bunkers' General Terms and Conditions.

It is well settled "that parties to a contract may agree in advance to submit to the jurisdiction of a given court, to permit notice to be served by the opposing party, or even to waive notice altogether."  *National Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315, 316 (1965).

In *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95 (2d Cir. 2006), the Court of Appeals for the Second Circuit held that forum selection clauses, such as that contained in the Chemoil General Terms and Conditions, are regularly enforced when several conditions are met:  (i) the existence of the clause must have been reasonably communicated to the parties, (ii) the clause cannot have been obtained through fraud or overreaching and (iii) enforcement of the clause cannot be unreasonable or unjust.  *Id.* at 103.  *See also Hovensa LLC v. Kristensons-Petroleum, Inc.*, No. 12-5706, 2013 WL 1803694, at *4 (S.D.N.Y. April 26, 2013).

Applying the test laid down in *D.H. Blair & Co., Inc. v. Gottdiener*, it is clear that the irrevocable submission to the exclusive jurisdiction of the U.S. District Court for the Southern District of New York is effective and binding as against the O.W. Bunker and Chemoil entities that have been joined as Interpleader Defendants to this action.

The existence of this clause was communicated to all parties.  With respect to the Chemoil entities that have been joined as Interpleader Defendants, it should only be necessary to point out that this forum selection provision is part of Chemoil's General Terms and

Conditions.[3]  O.W. Bunker Interpleader Defendants were clearly made aware of the existence of this provision when they received the Chemoil Order Confirmation on October 21, 2014.

It would seem to be beyond reason to argue that the forum clause in the Chemoil General Terms and Conditions might have been obtained through fraud or overreaching.

The last factor in this test states that the forum selection will be enforced unless it is clearly shown that enforcement would be unreasonable and unjust.  Clearly, there is nothing on the face of the forum selection provision, or in its anticipated operation, that even suggests its enforcement might be unreasonable or unjust.  Quite the contrary, enforcement of the Chemoil and O.W. Bunker Interpleader Defendants' contractual submission to this Court's jurisdiction is fully consistent with the equitable purposes of 28 U.S.C. § 2361.

**D.    Interpleader is Available in Admiralty and Maritime Jurisdiction Matters**

Courts have permitted interpleader in the actions commenced under the district courts' admiralty and maritime jurisdiction.  In *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550 (5th Cir. 2004), two competing maritime attachment actions, commenced pursuant to Rule B of the Supplemental Admiralty Rules, were brought against the charterer[4] of a vessel, seeking to attach the same fund of freight owed under a sub-charter (sub-lease) of the vessel.  The charterer, the defendant in both maritime attachment actions, filed an action for interpleader. The interpleader court consolidated both attachment actions and granted the charterer leave

---

[3] Clause 14 of the Chemoil Terms and Conditions also provides for an irrevocable waiver of actual personal service of process in connection with any action commenced in this Court.  In lieu of personal service, the Chemoil Terms and Conditions allow written notice of any such action to be given by "hand delivery or by certified or registered pre-paid mail (provided that notice shall also be given by telex, facsimile, or other written communication that such mailed notice has been sent, no later than the second day following the date of mailing)."  OSG shall comply with these notice requirements.

[4] A "charter" is a contract for the lease of a vessel; a "charterer" is a party that leases a vessel.

to deposit into the court registry and discharged the charterer from the lawsuit.  *See also*

*Schirmer Stevedoring Co. Ltd. v. Seaboard Stevedoring Corp.*, 306 F.2d 188 (9th Cir. 1962) (an

interpleader action in which *in personam* and *in rem* actions were filed for stevedoring

services).

The rights of maritime lien holders are not prejudiced in an interpleader action.  In

maritime cases, a claimant seeking to enforce a maritime lien against a vessel commences a

vessel arrest proceeding under Rule C of the Supplemental Admiralty Rules.  Supplemental Rule

E allows for the release of an arrested vessel or property upon the posting of security for the

claim to abide the eventual judgment of the court.  Once security has been provided in

exchange for the Vessel's release, the plaintiff's *in rem* lien is transferred from the vessel to the

fund that represents the security.  *Incas and Monterey Printing and Packaging, Ltd. v. M/V*

*SANG JIN*, 747 F.2d 958, 961 (5th Cir. 1984); *J.K. Welding Co., Inc. v. Gotham Marine*

*Corporation*, 47 F.2d 332, 334 (S.D.N.Y. 1931).

Any rights the Interpleader Defendants' might hold to assert maritime liens in this

dispute will be fully preserved in this interpleader action since their maritime lien claims can be

asserted against the funds OSG wishes to deposit into the registry of the Court.  *See, e.g.,*

*Starboard Venture Shipping, Inc. v. Cainomar Transp., Inc.*, No. 93-644, 1993 WL 464686, at *4

(S.D.N.Y. Nov. 9, 1993) and *Ravenna Tankers Pte. V. Omni Ships Pte. Ltd.*, 2014 A.M.C. 1190

(E.D. La. 2013) (a claimant's lien can attach to funds in the registry of the Court since such funds

were deemed substituted security for the vessel).

The Disputed Funds, which OSG wishes to deposit in the registry of the Court, constitute

the entire amount in dispute among the various claimants in this matter plus interest required

by Supplemental Admiralty Rule E(5)(a) and may, therefore, be deemed security provided by

OSG, as owner of the Vessel, pursuant to Rule E of the Supplemental Admiralty Rules, just as

though the Interpleader Defendants had, in fact, been provided security after having served a

warrant of arrest on the Vessel in a U.S. judicial district or had arrested the Vessel in a

jurisdiction outside the United States.

Courts sitting in admiralty have broad discretion to fashion equitable remedies.  As

discussed in more detail below, the Court's equitable powers include issuing orders enjoining

arrest of a vessel anywhere in the world for a claim in which the owner has posted substitute

security under Rule E(5)(a).  As such, the power of the District Court may reach beyond the

express language of 28 U.S.C. § 2361 when the Court has determined the substitute *res* under

Rule E(5)(a) has been deposited in the registry of the Court.  OSG seeks to deposit such amount

in this case in order to prevent the arrest of the Vessel by Interpleader Defendants anywhere in

the world on a claim for the delivery of the Fuel.

By commencing this interpleader action, OSG submits to this Court's jurisdiction for the

amount claimed by several parties for the delivery of the Fuel to the Vessel and seeks to

provide a substitute *res* reflecting the very funds which will secure claimants' maritime lien

claims.  The balance of equities, therefore, weighs in favor of enjoining arrest or attachment

against OSG or the Vessel.

**E.     OSG's Interpleader Action Does Not Violate the Automatic
        Stay Arising Out of the O.W. Bunkers Bankruptcy Proceedings**

The commencement of this interpleader action does not violate the automatic stay

under 11 U.S.C. § 362 since it does not seek to obtain property of any of the debtors in a

bankruptcy proceeding.  *See, e.g., Price & Pierce Int'l Inc. v. Spicers Int'l Paper Sales, Inc.*, 50 B.R. 25 (S.D.N.Y. 1985) (an interpleader action, in which a bankrupt debtor was named as a defendant).  The Court held that the interpleader was not subject to automatic stay because the debtor was only a nominal defendant in the interpleader.  The court noted that the automatic stay "does not operate to stay all actions involving the bankrupt."  *Id.* at 26.  Focusing on the interpleader action before it, the Court observed:

> The automatic stay provision normally applies to actions in which the bankrupt is a defendant.  Although SIPSI [the bankrupt debtor] is a named defendant, its status in that regard is nominal.  In making claim to the Fund, SIPSI takes the role of plaintiff in this action.  Thus, this is not an action to obtain possession of property held by SIPSI, as required for the invocation of § 362; rather, it is an action to determine whether the Fund, or some part thereof, rightfully belongs to Papeteries or SIPSI.

*Id.*

The automatic stay provision is not intended to divest a federal district court of jurisdiction over a debtor entity, where, as here, the purpose of the interpleader action is not to deprive a debtor of its property, but to determine title as among competing claimants to the property deposited with the Court.  During the pendency of the interpleader action, the property deposited in the registry of the Court is not the property of the debtor within the meaning of 11 U.S.C. § 362.  *Prudential Ins. Co. v. Moschella*, No. 12-2423, 2013 WL 2154880 at *4 (M.D. Fl. May 16, 2013); *see also Neb. Ass'n of Sch. Bds., Inc. v. Strategic Governmental Solutions, Inc.*, 2009 No. 08-3052, 2009 WL 205056 at *2 (D. Neb. Jan. 26, 2009) ("an interpleader action is not an action to obtain possession of property of the bankruptcy estates or property from the estates, even though the debtors are among the parties claiming an interest in the interpleader funds.  The funds are not considered part of the bankruptcy estates

prior to a determination of title."), and *National Co-op. Refinery Ass'n v. Rouse*, 60 B.R. 857,

859-60 (D. Colo. 1986) (an automatic stay triggered by one claimant's bankruptcy filing does not

divest court of jurisdiction to adjudicate interpleader whose purpose was to determine title to

funds not yet property of the debtor's estate within the meaning of Code § 362(a)).

F.    **The Court has Requisite Authority to**
      **Issue a Restraining Order Binding Upon the**
      **Chemoil Interpleader Defendants Situated Overseas**

Courts of equity in interpleader actions "may and frequently do give incidental relief by

injunction to secure the full benefits of the adjudication and to terminate the litigation in a

single suit."  In *State of Texas v. State of Florida*, 306 U.S. 398, 412 (1939), the U.S. Supreme

Court stated that "[W]hen the equity powers of the Court have been invoked it has power in its

discretion to give such incidental relief by way of injunction as will make its determination the

effective means of avoiding risk of loss to any of the parties by reason of the asserted multiple

. . . liability."  *See also Indianapolis Colts v. Mayor and City Council of Baltimore*, 741 F.2d 954,

960 (7th Cir. 1984).  "The injunctive power is nationwide and is intended to halt any proceeding

the court deems inconsistent with the interpleader proceeding."  *Beaufort Navigation, Inc. v.*

*Med Africa Line S.P.A.*, 624 F. Supp. 229, 232-33 (S.D.N.Y. 1985).

It is also beyond dispute that a U.S. court, in the exercise of its equitable powers, may

restrain a party before it, and subject to its personal jurisdiction, from pursuing litigation in a

foreign forum.  *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006);

*Paramedics Electromedicina Comercial, Ltda v. G.E. Medical Sys. Info. Technologies, Inc.*, 369

F.3d 645, 652 (2d Cir. 2004).

While the federal courts use their power to issue anti-suit injunctions sparingly and will often tolerate concurrent jurisdiction in two courts over *in personam* claims, the same restraint is not shown in *in rem* proceedings.  A long-standing exception to the rule tolerating concurrent *in personam* actions has been recognized for *in rem* or *quasi in rem* proceedings.  In such cases, the court having custody of the *res* has exclusive jurisdiction to proceed, in order to protect its jurisdiction.  *Donovan v. City of Dallas*, 377 U.S. 408, 412 (1964); *Federal Deposit Ins. Corp. v. Four Star Holding Co.*, 178 F.3d 97, 102 (2d Cir. 1999); *China Trade and Dev. Corp. v. M/V CHOONG YONG*, 837 F.2d 33, 36 (2d Cir. 1987).

In this case, the Interpleader Defendants are asserting competing claims to and against the Disputed Funds that will be deposited with the registry of the Court since this is clearly a proceeding that will potentially adjudicate *in rem* claims against the *res* or funds held in the registry of the Court.  As such, issuance of a restraining order, directing the Interpleader Defendants to refrain from commencing actions to enforce their claims in other courts, both within and without the United States, would be a proper exercise of the Court's equity powers to preserve the Court's jurisdiction over the funds held in the registry of the Court.  The requested restraining order will protect the jurisdiction of this Court and will prevent a multiplicity of actions against OSG and the Vessel.  OSG disclaims any interest in the Disputed Funds and are unable to determine the validity of any claimant's possible maritime lien on the Vessel or other claims related to the Disputed Funds.

## CONCLUSION

OSG is an innocent stakeholder in the larger, more complicated dispute between Chemoil, OWB-USA and any other entities that may claim an interest in the Disputed Funds.

OSG stands ready to pay the full amount for the Fuel it purchased from OWB-USA into the registry of the Court.

OSG and the Vessel face a real threat of arrest because multiple claimants are demanding to each be paid the Disputed Funds.  OSG should not be required to pay the same debt to multiple creditors multiple times, nor provide independent security to multiple parties asserting an interest in the Disputed Funds, which will be deposited into the registry of the Court.  The requested retraining order will protect the jurisdiction of this Court and will prevent a multiplicity of actions against OSG and its Vessel, as OSG disclaims any interest in the Disputed Funds, but is unable to determine the validity of the claimants' respective demands and avoid asserted maritime liens on the Vessel.  If an injunction is not issued and the Vessel is arrested, attached, seized or detained, the Vessel will be unable to conduct maritime commerce, harming the parties with interest in the Vessel's cargo, to the extent any exists.  Without immediate court relief, as OSG requests, OSG will suffer irreparable injury for which any legal remedy would be inadequate and which outweighs any possible injury to the Interpleader Defendants from issuance of the requested relief.

For the reasons set forth above, Interpleader Plaintiffs OSG Ship Management, Inc. and 1372 Tanker Corporation request that this Court enter an order pursuant to 28 U.S.C. § 2361 of the Federal Interpleader Act, against Interpleader Defendants O.W. Bunker USA, Inc., Chemoil Corporation, Chemoil DMCC, GPS Chemoil LLC FZC and ING Bank NV (collectively, the "Interpleader Defendants"), (1) enjoining and restraining the Interpleader Defendants from instituting or prosecuting any action, other than this interpleader action, in any way relating to or concerning the Disputed Funds or the Interpleader Plaintiffs' obligations to any of the

Interpleader Defendants involved in this interpleader action, pending further order of the Court; and (2) enjoining and restraining the Interpleader Defendants from instituting and prosecuting any proceeding *in rem* against the vessel M/V OVERSEAS MULAN, including but not limited to any arrest of the vessel M/V OVERSEAS MULAN, pending further order of the Court.

Dated:   New York NY
         December 18, 2014

                              BURKE & PARSONS
                              Attorneys for Plaintiffs
                              OSG Ship Management, Inc. and
                              1372 Tanker Corporation

                              By: /s/  William F. Dougherty
                                   William F. Dougherty
                                   Michael J. Walsh
                                   100 Park Avenue
                                   New York NY  10017-5533
                                   (212) 354-3800
                                   dougherty@burkeparsons.com
                                   walsh@burkeparsons.com
                                   Telefax:  (212) 221-1432

9427_0002_S00.DOCX